



# SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
## CIVIL DIVISION

IARGARETTA SIBERT-DEAN

Vs.

/ASHINGTON MASS TRANSIT

C.A. No.    2008 CA 007814 B

## INITIAL ORDER AND ADDENDUM

Pursuant to D.C. Code § 11-906 and District of Columbia Superior Court Rule of Civil Procedure "SCR Civ") 40-I, it is hereby **ORDERED** as follows:

(1) Effective this date, this case has assigned to the individual calendar designated below. All future filings n this case shall bear the calendar number and the judge's name beneath the case number in the caption. On iling any motion or paper related thereto, one copy (for the judge) must be delivered to the Clerk along with the >riginal.

(2) Within 60 days of the filing of the complaint, plaintiff must file proof of serving on each defendant: :opies of the Summons, the Complaint, and this Initial Order. As to any defendant for whom such proof of ;ervice has not been filed, the Complaint will be dismissed without prejudice for want of prosecution unless the :ime for serving the defendant has been extended as provided in SCR Civ 4(m).

(3) Within 20 days of service as described above, except as otherwise noted in SCR Civ 12, each defendant must respond to the Complaint by filing an Answer or other responsive pleading. As to the defendant who has failed to respond, a default and judgment will be entered unless the time to respond has been extended as provided in SCR Civ 55(a).

(4) At the time and place noted below, all counsel and unrepresented parties shall appear before the assigned judge at an Initial Scheduling and Settlement Conference to discuss the possibilities of settlement and to establish a schedule for the completion of all proceedings, including, normally, either mediation, case evaluation, or arbitration. Counsel shall discuss with their clients **prior** to the conference whether the clients are agreeable to binding or non-binding arbitration. **This order is the only notice that parties and counsel will receive concerning this Conference.**

(5) Upon advice that the date noted below is inconvenient for any party or counsel, the Quality Review Branch (202) 879-1750 may continue the Conference **once**, with the consent of all parties, to either of the two succeeding Fridays. Request must be made not less than six business days before the scheduling conference date. No other continuance of the conference will be granted except upon motion for good cause shown.

Chief Judge Rufus G. King, III

Case Assigned to:  Judge JEANETTE J CLARK
Date:   November 1, 2008
Initial Conference: 9:30 am, Friday, January 30, 2009
Location:   Courtroom 219
          500 Indiana Avenue N.W.
          WASHINGTON, DC  20001

Caio.doc

## ADDENDUM TO INITIAL ORDER AFFECTING
## ALL MEDICAL MALPRACTICE CASES

In accordance with the Medical Malpractice Proceedings Act of 2006, D.C. Code § 16-2801, et seq. (2007 Winter Supp.), "[a]fter an action is filed in the court against a healthcare provider alleging medical malpractice, the court shall require the parties to enter into mediation, without discovery or, if all parties agree[,] with only limited discovery that will not interfere with the completion of mediation within 30 days of the Initial Scheduling and Settlement Conference ("ISSC"), prior to any further litigation in an effort to reach a settlement agreement. The early mediation schedule shall be included in the Scheduling Order following the ISSC. Unless all parties agree, the stay of discovery shall not be more than 30 days after the ISSC." D.C. Code § 16-2821.

To ensure compliance with this legislation, on or before the date of the ISSC, the Court will notify all attorneys and *pro se* parties of the date and time of the early mediation session and the name of the assigned mediator. Information about the early mediation date also is available over the internet at https://www.dccourts.gov/pa/. To facilitate this process, all counsel and *pro se* parties in every medical malpractice case are required to confer, jointly complete and sign an EARLY MEDIATION FORM, which must be filed no later than ten (10) calendar days prior to the ISSC. Two separate Early Mediation Forms are available. Both forms may be obtained at www.dccourts.gov/medmalmediation. One form is to be used for early mediation with a mediator from the multi-door medical malpractice mediator roster; the second form is to be used for early mediation with a private mediator. Both forms also are available in the Multi-Door Dispute Resolution Office, Suite 105, 515 5th Street, N.W. (enter at Police Memorial Plaza entrance). Plaintiff's counsel is responsible for eFiling the form and is required to e-mail a courtesy copy to earlymedmal@dcsc.gov. *Pro se* Plaintiffs who elect not to eFile may file by hand in the Multi-Door Dispute Resolution Office.

A roster of medical malpractice mediators available through the Court's Multi-Door Dispute Resolution Division, with biographical information about each mediator, can be found at www.dccourts.gov/medmalmediation/mediatorprofiles. All individuals on the roster are judges or lawyers with at least 10 years of significant experience in medical malpractice litigation. D.C. Code § 16-2823(a). If the parties cannot agree on a mediator, the Court will appoint one. D.C. Code § 16-2823(b).

The following persons are required by statute to attend personally the Early Mediation Conference: (1) all parties; (2) for parties that are not individuals, a representative with settlement authority; (3) in cases involving an insurance company, a representative of the company with settlement authority; and (4) attorneys representing each party with primary responsibility for the case. D.C. Code § 16-2824.

No later than ten (10) days after the early mediation session has terminated, Plaintiff must eFile with the Court a report prepared by the mediator, including a private mediator, regarding: (1) attendance; (2) whether a settlement was reached; or, (3) if a settlement was not reached, any agreements to narrow the scope of the dispute, limit discovery, facilitate future settlement, hold another mediation session, or otherwise reduce the cost and time of trial preparation. D.C. Code § 16-2826. Any Plaintiff who is *pro se* may elect to file the report by hand with the Civil Clerk's Office. The forms to be used for early mediation reports are available at www.dccourts.gov/medmalmediation.

Chief Judge Rufus G. King, III

Caio.doc

CA Form 1

# Superior Court of the District of Columbia
### CIVIL DIVISION
**500 Indiana Avenue, N.W.,  Room JM-170**
**Washington, D.C. 20001  Telephone: 879-1133**

*MARGARETTA SIRGENT-DEAN*

*Plaintiff*

vs.

Civil Action No. **0007814-08**

*WASHINGTON MASS TRANSIT*

*Defendant*

## SUMMONS

To the above named Defendant:

You are hereby summoned and required to serve an Answer to the attached Complaint, either personally or through an attorney, within twenty (20) days after service of this summons upon you, exclusive of the day of service. If you are being sued as an officer or agency of the United States Government or the District of Columbia Government, you have sixty (60) days after service of this summons to serve your Answer. A copy of the Answer must be mailed to the attorney for the party plaintiff who is suing you. The attorney's name and address appear below.   If plaintiff has no attorney, a copy of the Answer must be mailed to the plaintiff at the address stated on this Summons.

You are also required to file the original Answer with the Court in Room JM 170 at 500 Indiana Avenue, N.W., between 8:30 a.m. and 5:00 p.m., Mondays through Fridays or between 9:00 a.m. and 12:00 noon on Saturdays. You may file the original Answer with the Court either before you serve a copy of the Answer on the plaintiff or within five (5) days after you have served the plaintiff. If you fail to file an Answer, judgment by default may be entered against you for the relief demanded in the complaint.

*Clerk of the Court*

*DONNELL MICHEAL*
_____
Name of Plaintiff's Attorney

*6009 MOON SAILS LANE*
_____   By _____
Address                                Deputy Clerk
*CLARKSVILLE, MD 21029*

*443-535-0076*
_____   Date _____
Telephone

**PUEDE OBTENERSE COPIAS DE ESTE FORMULARIO EN ESPANOL EN EL TRIBUNAL SUPERIOR DEL DISTRITO DE COLUMBIA, 500 INDIANA AVENUE, N.W., SALA JM 170**

**YOU MAY OBTAIN A COPY OF THIS FORM IN SPANISH AT THE SUPERIOR COURT OF D.C., 500 INDIANA AVENUE, N.W., ROOM JM 170**

**NOTE: SEE IMPORTANT INFORMATION ON BACK OF THIS FORM.**

CV(6)-456/May 03

MARGARETTA SIBERT-DEAN      *    IN THE
2823 Sherpperton Terrace
Silver Spring, MD 20904           *    SUPERIOR COURT

    Plaintiff,             FOR THE

vs.                    DISTRICT OF COLUMBIA,

WASHINGTON MASS TRANSIT     *    CIVIL DIVISION
600 5th Street, N.W.
Room 8F
Washington, D.C. 20001       *    Civil Case No.: ___**0007814-08**

    Defendant
*    *    *    *    *    *    *    *    *    *    *



RECEIVED
Civil Clerk's Office
NOV 0 1 2008
Superior Court of the
District of Columbia
Washington, D.C.

*verified!* **COMPLAINT**

TO THE HONORABLE, THE JUDGE(S) OF SAID COURT:

     NOW COMES, Margaretta Sibert-Dean, (hereinafter referred to as "Plaintiff"), by and through his attorney, Donnell H. McNeal of the Law Offices of Donnell H. McNeal after attempting to reasonably resolve this matter in an amicable fashion and without the involvement of litigation to no avail, hereby files this Complaint pursuant to the District of Columbia Code §§11-921(a) and 11-924, et al, against the Washington Mass Transit Authority (hereinafter referred to as "Defendant" or "Defendant Driver"). In further support, Plaintiff states the following:

## INTRODUCTORY STATEMENTS

1.    This is an action for (I) damages and (ii) indemnification.

2.    Prior to the accident, the Plaintiff, a married female and mother of one, was a U.S. Army Veteran and community activist in the District of Columbia. The Plaintiff was a youth and adult counselor and volunteered her time in the areas of education, recreation and employment. The Plaintiff serve as a mediator and facilitator for D.C. Superior Court Juvenile Restitution Program and was a regular attendee and presentor at Councilmember hearings. The Plaintiff had been employed with the U.S. Federal Postal Service for over 19 years.

3.    After the accident, the Plaintiff had to literally learn how to walk and talk again as she suffered a left side paralysis to her entire body. Because the Plaintiff was unable to work and had to undergo many medical treatments, the Plaintiff lost her home and most of her personal possessions.

## JURISDICTION AND VENUE

4. Pursuant to DC. Code § 11-921(a), the Superior Court has jurisdiction of any civil action or other matter (at law or in equity) brought in the District of Columbia.

5. Pursuant to DC Code § 11-924, the Superior Court has jurisdiction with respect to any violation, committed in the District of Columbia, of the rules and regulations adopted by the Washington Metropolitian Area Transit Authority under section 76(e) of title III of the Washington Metropolitian Area Transit Regulation Compact.

## COUNT I
## NEGLIGENCE

6. Plaintiff incorporates by reference as if fully stated herein averments 1 through 5.

7. On 2-14-06 at approximately 11:15 AM, while the Plaintiff, a paid faire of the Washington Mass Transit (WMATA), was seated and traveling South on the 3800 block of Georgia Avenue in N.W., District of Columbia, in route to her destination (i.e., work).

8. Another motorist operating a 2000 Lexus 300RX SUV, DC Tags BE8260, VIN JT64FIOUXY0120501 made a left turn in front of the WMATA bus from an opposing lane traveling North bound on the 3800 block of Georgia Avenue, in an attempt to turn into the parking lot of a shopping center.

9. Dante Deangelo Dinkins, the employee and WMATA bus driver, acting within the scope of his authority and employment with WMATA operated the bus in a negligently and careless manner as the Defendant driver was looking in another direction and was preoccupied with staring at women as they walked by. As a result, the Defendant failed to see the motorist operating the 2000 Lexus make a left turn and did not have time to properly stop the bus in order to avoid an accident.

10. The Plaintiff screamed at the Defendant in an attempt to get the bus driver to refocus his attention on the road in front of him.

11. After hearing the screams from both the Plaintiff and other faires, the Defendant attempted a defensive driving maneuver in order to avoid the impending accident which caused the Plaintiff to become jettison from the seat on which the Plaintiff sat and thrown into a steal handrail pole and knocked unconscious.

12. The Defendant had a duty of care to operate the WMATA vehicle in a proper fashion, and breached this duty off care by failing to operate the WMATA vehicle in a safe and proper



manner by giving full time and attention to the road in front of the driver.

13.    The Metropolitan Police Department responded and only asked the Plaintiff for her name and if she was alright. The responding officer never at any time asked the Plaintiff if she saw what happened. The responding officer later only cited the driver of the other vehicle with failure to yield the right of way. **[EXHIBIT A]**[1] The accident scene revealed divided lines for traffic proceeding north and south bound and solid yellow lines down the center of the Georgia Avenue. **[EXHIBIT B]**[2]

14.    On 2-14-06, the Plaintiff was transported directly from the accident scene to Washington Hospital Center via ambulance. Upon arriving at the hospital, the Plaintiff was examined and treated for head, cervical, shoulder, back and arms injuries. The Plaintiff experienced dizziness, numbness, was unable to stand and in a great deal of pain. The Plaintiff was treated and  later released that same day. **[EXHIBIT C]**[3] During the initial examination of the Plaintiff, doctors at Washington Hospital failed to properly identify the more serious head aneurysm that the Plaintiff suffered. This injury would not be realized until later.

15.    On 2-20-06, the Plaintiff was successful in setting up a medical appointment with the Medical Office of Dr. William Albert, MD located at 4444 Connecticut Ave, N.W. Washington, D.C.  20008. The Plaintiff complained about pain radiating down both arms to her fingers and numbness and tingling in both the upper extremities. Plaintiff experienced spasms and difficulty with sleeping and waking up in pain. Dr. Albert noticed that the Plaintiff was agitated and loss the normal cervical lordosis. The Plaintiff's muscle strength and range of motion decreased in both upper extremities. The Plaintiff's sternocleidomastoid muscles (SCM) were in spasms and tender to the touch. Both the left and right trapezius and paravertebral muscles were in spasms and tender to the touch. Plaintiff was not able to walk from heal to toe. The Plaintiff was diagnosed as having traumatic cervical torticollis, upper back pain and numbness and dysesthesias about the upper extremeties. Dr. Albert suggested myotherapy with hot and cold packs

---

[1][A] Washington D.C. Metropolitan Police Department traffic accident report taken on 2-14-06, Complaint # 020-289 and Log# 06-1877.

[2][B] Global Position Satellite pictures taken of the accident scene at different magnification levels.

[3][C] Medical report written by the Kevin C. Reed, M.D., at Washington Hospital Center immediately after the accident after the Plaintiff was transported to hospital and seen by many different physicians.

3



and scheduled a second visit for two (2) days later. [**EXHIBIT D**][4]

16. Two (2) days later the Plaintiff returned in practically the same condition with the same issues. Dr. Albert suggested integrating kinetic activities and EMS for 3-4 weeks. Dr. Albert also suggested that the Plaintiff undergo NCV studies of upper extremities should numbness and dysesthesias continue.[5] After the medical examination on 3-1-06, the Plaintiff was requested to undergo NCV studies. Dr. Albert setup the initial NCV studies appointment for 3-6-06.[6]

17. On 3-6-06, Dr. Albert evaluated the NCV studies which showed significant differences between the Plaintiff's Motor Left nerve (AFB) compared with her right median nerve (AFB). The left showed less amplitude (9.07mv) compared to the right (12.32mv).[7] Dr. Albert felt that there was an area of pathology involving the Plaintiff's left anterior cervical region which was thought to show swelling. Dr. Albert suggested obtaining an MRI if the Plaintiff's problematic symptoms continued after treatment.

18. On 3-15-06, Dr. Albert scheduled the Plaintiff to get a MRI of the cervical spine. The MRI revealed posterior protrusions of the disc between C3 through C6. At the C3-4 level disc degenerative disease and disc bulges posteriorly were noticed. At the C4-5 level, a left paracenteral posterior disc herniation were noticed. The disc in this area protruded posteriorly about 4mm which causes focal compression against the left anterior thecal sac contour. At the C5-6 level a left-sided posterior disc herniation with disc protrusions posteriorly 3.5mm were identified. [**EXHIBIT E**][8]

19. On 3-17-06, Dr. Albert scheduled the Plaintiff to get a MRI of the right shoulder. The MRI revealed full thickness tear of the supraspinatus tendon distally which left a 1cm fluid-filled gap. Fluid was noticed along the infraspinatus tendon towards the myotendinous junction. The thickening of the tendon suggest tendinopathy. Acromioclavicular osteoarthritis with inferiorly directed osteophytes impressing the supraspinatus myotendinous junction was noticed along with a tiny effusion in the glenohumeral joint. The MRI revealed a rotator cuff tear about the supraspinatus and

---

[4][D] Medical report written by Dr. William Albert on 2-20-06 after a medical examination of the Plaintiff.

[5]Id at page 3. Plaintiff's medical visit on 2-22-06.

[6]Id at page 4. Dr. Albert sets ups Plaintiff for NCV studies appointment on 3-6-06.

[7]Id at page 5. Dr. Albert's evaluation of NCV study findings.

[8][E] MRI report submitted on 3-15-06 by Howard Sachs, M.D. of Health South Diagnostic Center.

4



infraspinatus tendons. [**EXHIBIT F**][9]

20.   After two (2) months of treatment, the Plaintiff's numbness and tingling became some what manageable. However, the upper back spasms and pain continued. Dr. Albert was not able to conduct any meaningful physical therapy because the Plaintiff was in so much pain.

21.   On 5-25-06, the Plaintiff went to Washington Brain & Spine Institute for a neurosurgical consultation with F. Donald Cooney, MD because of the persistent neck, shoulder and lower back pain and numbness in both hands and feet. After reviewing MRIs of the Plaintiff's cervical and lumbar spine, Dr. Cooney diagnosed the Plaintiff as having lumbar stenosis and cervical spondylosis at C5-6 because of the cervical disc changes with degenerative changes at c5-6 and mild protrusions with spondylosis. [**EXHIBIT G**][10]

22.   Dr. Cooney requested that the Plaintiff return for a follow-up visit and bring Dr. Albert's medical reports, EMG and all studies conducted on the Plaintiff in order to get a better perspective of the Plaintiff condition. However, Plaintiff suffered a stroke on 6-24-06.

23.   On 6-24-06, the Plaintiff was admitted to the Washington Hospital Center for an acute ischemic stroke. While playing video poker on her personal home computer with some friends, the Plaintiff blacked out and fell asleep on 6-23-06 around 5:30PM. The Plaintiff awoke to her cell phone ring around 9:30PM on that same day with weakness and numbness in her left hand. The Plaintiff had a left-sided paraparesis/hemiparesis and slurred speech. The Plaintiff's face drooped as well. The next day the Plaintiff's husband called the ambulance around 8:30AM and the Plaintiff was rushed to the Emergency Department at Washington Hospital Center. The Plaintiff was lethargic and difficult to arouse. A CT scan was conducted on Plaintiff's head at 10:20AM and an intracranial hemorrhage/infarction of the right middle cerebral artery was discovered. An MRI/MRA was performed at 1:50PM and revealed an acute infarction involving the right insular and frontoparietal cortices. The MR examination also suggested a right internal carotid artery dissection. The Plaintiff was enrolled in the National Institute of Health (NIH) ROSIE-MR study. Further evaluation of the MRA revealed two (2) 5mm aneurysms arising from the anterior communicating artery and the supraclinoid right internal carotid artery.

---

[9][F] MRI report submitted on 3-17-06 by M. Loren Perlmutter, M.D. of the Health South Diagnostic Center.

[10][G] Neurosurgical consultation on 5-25-06 with F. Donald Cooney, M.D. of Washington Brain & Spine Institute.

**[EXHIBIT H]**[11] While Plaintiff tried to respond to all procedures as optimistically as possible, the Plaintiff progressively became seriously depressed and was believed to be bi-polar. However, prior to this accident, the Plaintiff has never suffered from any form of depression. Because of all the aforementioned conditions, the Plaintiff was placed on Colace, Acetaminophen, Anusol ointment, Benadryl, Lipitor, Coumadin and Lovenox. The Plaintiff was requested to follow-up for an interventional neurology medical examination in two (2) weeks or as rehabilitation situation would permit.

24.    On 6-29-06, the Plaintiff was evaluated by the National Rehabilitation Hospital (NRH). Plaintiff was placed on an American Heart Association Step 1 diet, recommended to get a rental wheelchair and small-based quad cane, tub bench and a 3-in-1 commode. Plaintiff was seen by a psychiatrist who recommended Plaintiff be placed on Depakote for mood stabilization. Plaintiff was discharged on 7-11-06 by Brendan E. Conroy, M.D. with a 30 day supply of medications. Dr. Conroy felt tha the Plaintiff was able to bath, groom, dress, and conduct toileting transfers with some assistance. Dr. Conroy also felt that Plaintiff would be able to ambulate outside of her residence with a rolling walker and walk up and down stairs with some assistance. **[EXHIBIT I]**[12]

25.    On 8-14-06, the Plaintiff went for an outpatient visit to Washington Hospital Center's Interventional-Radiology for the aneurysm suffered to be evaluated. A cerebral angiogram revealed a 5.0 x 4.9 x 7.3mm aneurysm with a 4.5 x 4.8mm neck pointing anterior and slightly upward from the anterior communicating artery. The aneurysm was on the left side. A second aneurysm measured approximately 5 x 4mm pointing upward from the paraopthalmic right interal carotid artery. The Plaintiff was advised of her options for unruptured brain aneurysms which included conservative observation, open surgical clipping and endovascular coiling with stent-buttressing. While the Plaintiff's aneurysms were amenable to endovascular intervention, it was believed that a stent was needed to buttress the coil for the endovascular treatment of the anterior communicating artery aneurysm. The risk and advantages of both procedures were explained to the Plaintiff and the Plaintiff decided to defer treatment, selected observational follow-up to monitor the aneurysm growth and obtain a second opinion at George Washington University Hospital. **[EXHIBIT J]**[13]

---

[11][H] Medical report submitted on 6-29-06 by Matthew Schrieber, M.D. of Washington Hospital Center pertaining to the evaluation of the Plaintiff between 6-24-06 through 6-29-06.

[12][I] Medical report submitted on 7-11-06 by Brendan E. Conroy, M.D. of the National Rehabilitation Hospital pertaining to the evaluation of the Plaintiff between 6-29-06 through 7-11-06.

[13][J] Medical report submitted on 8-14-06 by William O. Bank, M.D. of Washington Hospital Center pertaining to the evaluation of the Plaintiff.

26.     On 8-8-06, the Plaintiff was seen by Ryan g. Bosch, M.D. of Medical Faculty Associates and the Plaintiff was scheduled for several follow-up evaluations.

27.     On 8-16-06, the Plaintiff was seen by Kathleen M. Burger, D.O.  This was the physician that suggested having the Plaintiff discontinue Coumadin and switched the Plaintiff to take aspirin.  This physician requested that the Plaintiff continue Lipitor, stop physical therapy, keep the Plaintiff's blood pressure below 120/80 and to follow-up with after two (2) months.  Also, this  physician advised that she would check with the Washington Hospital Center stroke team to get approval on the suggested changes. **[EXHIBIT K]**[14]

28.     On 9-8-06, the cerebral angiogram performed at Washington Hospital Center was reviewed by Vivek Deshmukh, M.D.  Dr. Deshmukh discussed in great detail the natural history of intracranial aneurysms.  Dr. Deshmukh explained that while there was a low risk for subarachnoid hemmorrhage the Plaintiff was slightly at a increase risk for future subarachnoid hemorrhage.  It was explained that there was a 20% mortality rate and that 66% of patients suffered disabling injury related to subrachnoid hemorrhage.  The options for corrective procedures discussed were continued observation, surgical clip ligation and stent support coil embolization.  The procedures for all corrective procedures were explained and the Plaintiff expressed desire for craniotomy and clip ligation.  It was further explained to the Plaintiff that some of the potential complications involved in the sugical clip ligation were death, paralysis, bleeding, infection, re-operation, persistent pain, numbness, weakness, residual or recurrent aneurysm, blindness, asphasia, meningitis and stroke. **[EXHIBIT L]**[15]  It was suggested that the Plaintiff be examined again by neurology and if it was deemed feasible for the Plaintiff to stop taking Coumadin and wait a few months to allow maximum recovery from the stroke prior to having surgery.

29.     On 12-4-06, the Plaintiff underwent surgery which involved a right pterional crainiotomy, right orbitozygomatic osteotomy, right anterior clinoidectomy, clip ligation of the anterior communication artery aneurysm with an angled 6mm clip, clip ligation of the right ophthalmic artery aneurysm with a curved 8mm clip, right frontal sinus exoneration, packing of the right frontal sinus with bacitracin-infused Gelfoam and autologous vascularized pericranial grafting of the right frontal sinus.  The Plaintiff was placed under general edotracheal anesthesia. **[EXHIBIT M]**[16] The Plaintiff spent three (3) days in the

---

[14][K] Medical report submitted on 8-16-06 by Kathleen M. Burger, D.O. of Medical Faculty Associates.

[15][L] Medical report submitted on 9-8-06 by Vivek Deshmukh, M.D. of Medial Faculty Associates.

[16][M] Medical report submitted on 12-4-06 by surgeon, Vivek Deshmukh, M.D. of Medical Faculty Assoicates.

intensive care unit (ICU).

30.    On 12-6-06, Plaintiff reported decreased vision and being fatigued. **[EXHIBIT N]**[17]

31.    On 12-7-06, Plaintiff developed an abnormal excess accumulation of serous fluid in
       connective tissue (i.e., edema) about her right eye.  The Plaintiff was in pain and reported
       having headaches lasting for hours.  Plaintiff ability to walk was unsteady and had left
       side weakness.[18]

32.    On 12-18-06, the Plaintiff was concerned and complained about swelling and fluid
       around her incision.  The Plaintiff staples were removed the following day by Ann
       Robert, R.N. **[EXHIBIT O]**[19]

33.    On 1-26-07, the Plaintiff spent three (3) days in the ICU and had a decrease in hemoglin
       and hematocrit which eventually stablized. **[EXHIBIT P]**[20]

34.    On 4-27-07, the Plaintiff complained of constant and daily headaches mainly around the
       sugical incisions which had a throbbing rating of 10 of 10.  Upon further examination, it
       was determined that the Plaintiff had tightness over the neck and TM joints.  Plaintiff
       speech was still dysarthic.  **[EXHIBIT Q]**[21] The physician noted the chronic daily
       headache, depression, post concussion syndrome and TMJ disorder.

35.    On 5-14-07 Plaintiff complained about daily headaches.  A CT of the head was completed
       and bilateral subdural hygromas were noted.  Neurotin was prescribed for headaches.[22]

36.    On 6-1-07, Plaintiff complained and was very upset about hair loss because of the

---

[17][N] Medical report submitted on 12-6-06 by Julie Thomas of George Washington
University Hospital.  Page 19 of 19.

[18]Id at page 4 of 19.  Medical report submitted on 12-7-06 by Silvia Camargo, R.N. of
George Washington University Hospital.

[19][O] Medical report submitted on 12-18-06 by Margaret Fiore, N.P. of Medial Faculty
Associates.

[20][P] Medical report submitted on 1-26-07 by Kathleen M. Burger, D.O. of Medical
Faculty Associates.

[21][Q] Medical report submitted on 4-27-07 by Elham Bayat, M.D. of Medical Faculty
Associates.

[22]Supra at footnote 17.

prescribed Depakote. Therefore, Plaintiff advised physicians that she would cease from taking the medicine in the future. Plaintiff still complained about daily headaches. Plaintiff is prescribed Naproxen and Hydrocodone and was instructed to take prescriptions daily.[23]

37.    Because physicians felt it would be best to treat the more serious problems that the Plaintiff had with the dual aneurysm and because the Plaintiff was in too much pain to under go physical therapy, it was not until 12-20-07 that the Plaintiff follow back with physical therapy treatments with Douglas Shepard, M.D. of Multi-Specialty Health Care.

38.    During the initial evaluation with Dr. Shepard's office the Plaintiff complained of right paracervical and suprascapular pain and spasm. The Plaintiff had pain with prolonged flexed position of the neck and lateral rotation of the neck. There was tingling in the volar aspect of the right hand resulted in the Plaintiff's tendency to drop objects. Tingling was noticed in the left upper extremity dermatones. Right shoulder pain extended from the greater to deltoid tuberosity and increased with the lying in the right lateral decubitus position flaring with abduction exceeding 90 degrees. Dr. Shepard identified a right shoulder rotator cuff tear and a compromised left shoulder range of motion because of CVA surgery. [EXHIBIT R][24]

39.    The Plaintiff was referred to M.A. Reischer, M.D. for electromyography on 1-3-08. Dr. Reischer noticed that the Plaintiff's speech was slurred, left-side weakness, hyperreflexia and a mild right ulnar neuropathy at the elbow. [EXHIBIT S][25]

40.    On 2-5-08 the Plaintiff attended a follow-up with complaints of right shoulder pain. It was noted that the Plaintiff had a second MRI to check physiological changes since the first MRI and it was noted that the Plaintiff had a full thickness tear in the anterior insertion of the supraspinatus which had not changed. Plaintiff had severe pain and weakness when she tried to move her shoulders. A lateral upper arm area pain that seem to generate from the subacromial space. Plaintiff continued to have pain over the superior-anterior aspect of the chest, the entire neck, and right upper back and supraspinatus area. The Plaintiff's speech was slurred, ambulates with a cane and developed TMJ dysfunction and tooth grinding.

41.    Physical therapy to the neck and right shoulder was suggested three times a week for four

---

[23]Id.

[24][R] Medical report submitted on 12-20-07 by Douglas Shepard, M.D. of Multi-Specialty Health Care.

[25][S] Medical report submitted on 1-3-08 by M.A. Reischer, M.D. of Multi-Specialty Health Care.

weeks to increase the range of motion, diminish pain and increase strength. However, it was suggested that the Plaintiff get clearance from the neurosurgeon prior to aggressive therapy to the neck. [**EXHIBIT T**][26]

42.   After following up with neurosurgeons at George Washington Hospital, it was determined that it would not be advisable for the Plaintiff to have any physical therapy to the neck region because of the nerve damage from the accident may cause complications and further injury. However, physicians at George Washington Hospital deferred surgery to correct the rotator cuff injury to Dr. Shepard.

43.   The Plaintiff was been evaluated by a few physicians and psychologist that have opined and suggested psychological evaluation and treatment for the Plaintiff. Treating physicians at Washington Hospital Center diagnosed the Plaintiff with being suffering form bipolar, depressive and borderline personality disorders as a result of the Plaintiff's head injuries. [**EXHIBIT U**][27] Physicians at National Rehabilitation Medical Network (NRMN) also diagnosed the Plaintiff as having a bipolar disorder with depressed moods. When NRMN discharged the Plaintiff they noted that emotionally Plaintiff was somewhat labile with periods of manic behavior and alternating with periods of tearfulness and expressions of frustration. [**EXHIBIT V**][28]

44.   In the abundance of the psychological concerns, the Plaintiff was evaluated by the psychological team at Millersville Psychological Services (MPS). MPS suggest that the Plaintiff lost a significant amount of cognitive ability. After employing the Wechsler Adult Intelligence Scale-Third Edition (WAIS-III) test and reviewing the results, it was determined that the Plaintiff was significantly below average in performing mathematical functions, comprehension and digit symbol coding. The Plaintiff was below average in picture completion, picture arrangement, information. During follow-up consultations, psychologist learned that the Plaintiff had a great deal of confusion in completing ordinary task in her everyday life. The Plaintiff reported have great difficulty communicating. Plaintiff felt as if her behaviors/speech was childlike and that she was physically drained everyday. Psychologist noted that the Plaintiff was sad and slightly agitated. It was recommended that the Plaintiff obtain individual therapy to aide in coping with the devastating effects of her current neurological problems. [**EXHIBIT**

---

[26][T] Medical report submitted on 2-5-8 by Douglas Shepard, M.D. of Multi-Specialty Health Care.

[27][U] Medical report from Washington Hospital Center which provides secondary diagnoses for the Plaintiff outside of the primary diagnosis involving a cerebral infarction.

[28][V] Medical report submitted on 7-11-06 by Brendan E. Conroy, MD of the NRMN.

W][29]

45.   The Plaintiff's frustration with the "child-like" behaviors/speech can best be seen in the poem that the Plaintiff wrote and gave to her co-workers in 2006 in hopes of making them knowledgeable of what she was going through. [**EXHIBIT X**][30]

46.   One of the side affects of the multiple prescriptions that the Plaintiff was required to take outside of the hair loss and dental problems is reductions in vision. Prior to this accident, the Plaintiff has never needed prescription glasses as she has always had 20/20 vision. However, after the accident and surgery, the Plaintiff has had nothing but trouble with her eye sight. After the accident in February 2006, the Plaintiff eyesight decreased and the Plaintiff right eye was a 0.25 spherical while the left eye was 0.25 spherical. The Sterling Optical suggested adding glasses that would magnify and otherwise aide the Plaintiff's vision by 1.00 ou in order to achieve 20/15 in each eye. In January 2008, the Plaintiff returned after complaining about her vision and eye professionals at Sterling Optical increased the prescription of the Plaintiff glasses by 1.75 ou in order to achieve 20/20 in each eye. On the Plaintiff's visit to an ophthalmologist suggested in Feb 2008, the Plaintiff had a refraction of 1.25 in both the right and left eye. It was noted that the Plaintiff was wearing glasses with a refraction of 2.00 in the right and 1.50 in the left eye because the Plaintiff complained of the stoke affecting the right eye more than the left. [**EXHIBIT Y**][31]

47.   The Plaintiff lived a very active life prior to being stricken with the left side paralysis, slurred speech, drooping left side of her face, obesity, vision and hair loss, indefinite need for a walking cane, headaches, numbness, tingling, muscle spasms, cervical and lumbar pain, disc herniations and protrusions, loss of conscious, dual brain aneurysms, surgery, physial therapy, depression, stroke, dental issues, more than two (2) years of treatment and being on prescriptions for a myriad of medications with knowledge that the Plaintiff will never be the same. All of these unfortunate aspects of the Plaintiff's life stem from this accident.

48.   According to national statistics, the Plaintiff has an average has a life expectancy of 79.90 years. [**EXHIBIT Z**][32] For all practical purposes this is another 31.90 years. The sad

---

[29][W] Psychological evaluation conducted by Millersville Psychological Services on 11-10-07.

[30][X] Poem written by the Plaintiff in 2006 in an effort to help explain to co-workers what Plaintiff was going through.

[31][Y] Ophthalmologist letters Sterling Optical and Dr. Attokaren, O.D.

[32][Z] Life expectancy for a United States Female according to national statistics.

11

reality is that the Plaintiff fully expected to suffer from the side affects of the surgery, pain, medication for the remainder of her life.

49.     The Plaintiff works with the U.S. Postal Service and has done so for the last 20+ years. The Plaintiff is one of the celebrated employees at her place of employment because she adds something to work place that helps others to feel as if the workplace is more than a job.  The Plaintiff rarely missed any days from work prior to this accident.  However, immediately following this serious accident, the Plaintiff missed many days.

50.     According to the Human Resources Manager, the Plaintiff missed a total of 944 hours as a result of this accident as of October 27, 2007.  From the time of the accident through the month of October 2007, the Plaintiff made $23.70 per hour or $189.64 per day. Therefore, through October 2007, the Plaintiff loss a total of **$22,372.80** as a result of time that had to be taken off from work to deal with many medical appointments and incapacitation because of the accident. [**EXHIBIT A2**][33]

51.     The Plaintiff regularly has to continued to attend medical appointments through the present.  Therefore, in order to get a more accurate picture of the time missed, this record will have to be supplemented.

52.     The Plaintiff incurred many medical bills associated stemming from and directly related the 2-14-06 accident.  The medical bills and liens the Plaintiff incurred for treatment are as follows:

| PROVIDER | ACCOUNT # | BILLED $ | PAID $ | OWED $ |
|---|---|---|---|---|
| Washington Hospital Center | 20013355 | 42,058.87 | 41,958.87 | 100.00 |
| ««»«»«»«»«»«»«»«»«»«»«« | 118008366 | 11,853.93 | 11,249.84 | 604.09 |
| ««»«»«»«»«»«»«»«»«»«»«« | 19595198 | 939.12 | 677.52 | 261.60 |
| **Total** | | **54,851.92** | **53,886.23** | **965.69** |

[**EXHIBIT B2**][34]

| PROVIDER | ACCOUNT # | BILLED $ | PAID $ | OWED $ |
|---|---|---|---|---|

---

[33][A2] Employer wage loss verification for the Plaintiff through October 27, 2007.

[34][B2] Total of all medical bills incurred from Washington Hospital Center.

| Dr. William Albert | SIBMA000 | 6,130.00 | 0.00 | 6,130.00 |
|---|---|---|---|---|
| **Total** | | **6,130.00** | **0.00** | **6,130.00** |

[EXHIBIT C2][35]

| PROVIDER | ACCOUNT # | BILLED $ | PAID $ | OWED $ |
|---|---|---|---|---|
| Medical Faculty Associates | 3268863 | 40,152.00 | 1,233.56 | 38,918.44 |
| **Total** | | **40,152.00** | **1,233.56** | **38,918.44** |

[EXHIBIT D2][36]

| PROVIDER | ACCOUNT # | BILLED $ | PAID $ | OWED $ |
|---|---|---|---|---|
| Washington Brain & Spine Institute | 121530 | 350.00 | 335.00 | 15.00 |
| **Total** | | **350.00** | **335.00** | **15.00** |

[EXHIBIT E2][37]

| PROVIDER | ACCOUNT # | BILLED $ | PAID $ | OWED $ |
|---|---|---|---|---|
| George Washington University Hospital | 113131973 | 185.75 | 185.75 | 0.00 |
| "")"")"")"")"")"")"")"")"" | 113280382 | 2091.00 | 2091.75 | 0.00 |
| ")"")"")"")"")"")"")"" | 113296248 | 310.75 | 310.75 | 0.00 |
| ")"")"")"")"")"")"")"" | 112170469 | 10,255.75 | 10,221.25 | 34.50 |
| ")"")"")"")"")"")"")"" | 112241815 | 4,757.00 | 4,509.82 | 247.18 |
| ")"")"")"")"")"")"")"" | 112292255 | 84,331.60 | 84,231.60 | 100.00 |

---

[35][C2] Total of all medical bills incurred from Dr. William Albert's medical office.

[36][D2] Total of all medical bills incurred from Medical Faculty Associates.

[37][E2]Total of all medical bills incurred from Washington Brain & Spine Institute.

13

| Total | | 101,931.85 | 101,550.17 | 381.68 |
|---|---|---|---|---|

[EXHIBIT F2][38]

| PROVIDER | ACCOUNT # | BILLED $ | PAID $ | OWED $ |
|---|---|---|---|---|
| Center Radiology | 1304894 | 248.00 | 248.00 | 0.00 |
| ເຈເຈເຈເຈເຈເຈເຈ | 1303663 | 1,586.00 | 1,586.00 | 0.00 |
| ເຈເຈເຈເຈເຈເຈເຈ | 1331634 | 3,985.00 | 3,985.00 | 0.00 |
| ເຈເຈເຈເຈເຈເຈເຈ | 1333584 | 209.00 | 194.00 | 15.00 |
| ເຈເຈເຈເຈເຈເຈເຈ | 1256022 | 104.00 | 104.00 | 0.00 |
| Total | | 6,132.00 | 6,117.00 | 15.00 |
| PROVIDER | ACCOUNT # | BILLED $ | PAID $ | OWED $ |
| WHC Dept of Medicine | WD431370.2 | 516.00 | 516.00 | 0.00 |
| ເຈເຈເຈເຈເຈເຈເຈ | WD431370.1 | 26.00 | 26.00 | 0.00 |
| ເຈເຈເຈເຈເຈເຈເຈ | WD431370.3 | 93.00 | 93.00 | 0.00 |
| ເຈເຈເຈເຈເຈເຈເຈ | WD431370.4 | 831.00 | 831.00 | 0.00 |
| Total | | 1,466.00 | 1,466.00 | 0.00 |

[EXHIBIT G2][39]

| PROVIDER | ACCOUNT # | BILLED $ | PAID $ | OWED $ |
|---|---|---|---|---|
| Multi-Specialty Health Care | SIBEMA-00 | 2421.00 | 0.00 | 2421.00 |
| Total | | 2421.00 | 0.00 | 2421.00 |

[38][F2] Total of all medical bills incurred from George Washington University Hospital.

[39][G2] Total of all medical bills incurred from Center Radiology and WHC Dept of Medicine.

[EXHIBIT H2][40]

| PROVIDER | ACCOUNT # | BILLED $ | PAID $ | OWED $ |
|---|---|---|---|---|
| Medical Faculty Associates Prescriptions | 0903028 | 2,143.89 | 2,143.89 | 0.00 |
| Total | | 2,143.89 | 2,143.89 | 0.00 |

[EXHIBIT I2][41]

| PROVIDER | ACCOUNT # | BILLED $ | PAID $ | OWED $ |
|---|---|---|---|---|
| Sterling Optical | N/A | 1,832.91* | 1,832.91 | |
| Total | | 1,832.91* | 1,832.91 | |

[EXHIBIT J2][42]

53. The Defendant's negligence proximately caused Plaintiff to suffer all these serious injuries about head, body and limbs and to suffer great mental anguish, loss of work, wages, and her home. All injuries were solely caused by the negligence of the Defendant, without any negligence by the Plaintiff.

WHEREFORE, Plaintiff respectfully request that this Honorable Court:

A. Order the Defendant pay Four million ($4,000,000.00) dollars in compensatory damages, plus interest and cost.

B. Order such other and further relief as the nature of the Plaintiff's cause may require.

---

[40][H2] Total of all medical bills incurred from Multi-Specialty Health Care.

[41][I2] Total of all medical billing from Medical Faculty Associates for prescriptions.

[42][J2] Total of all billing from Sterling Optical for prescription glasses. Also, the (*) reflects the total amount of what has been paid. However, upon verifying outstanding balances, it was communicated that there Plaintiff has other unpaid bills. Will supplement upon receipt of said outstanding bills.

By:

Donnell H. McNeal, Esquire, Bar No.: 974077
Law Office of Donnell H. McNeal
6009 Moonsails Lane
Clarksville, MD 21029
Phone: (443) 535-0076
Facsimile: (443) 535-0216
Email: donnellmcneal1@aol.com

Attorney for Plaintiff

## JURY TRIAL DEMAND

Plaintiff respectfully request a jury trial in this matter.

## AFFIDAVIT

I solemnly swear and affirm under the penalties of perjury and upon personal knowledge,
all the above statements are true and correct to the best of my knowledge and I am competent to
attest to these matters.

By:

Margaretta Sibert-Dean
Plaintiff

16